SULLIVAN, Justice,
for the Court:
Pursuant to its statutory authority, the Department of Human Services (DHS) filed suit in 1991 against Milton Moore (Milton) in county court to determine the paternity and seek child support for an infant male, “M,” born November 18, 1987, to Pattie Taylor (Pattie). Evidence presented at trial concerning the relationship between Milton and Pattie is in obvious conflict. The jury returned a verdict in favor of Milton. The trial court denied DHS’ motions for a j.n.o.v. and a new trial. DHS appeals, assigning several errors. We reverse and remand for a new trial, based on erroneous jury instructions. It is necessary to discuss other issues, procedurally barred in this case, to prevent the repetition of errors.
FACTS
Pattie testified that she and Milton had sex on several occasions from November, 1986, and until about June, 1987, when she confirmed that she was pregnant. She deemed their relationship a romantic one, and did not have a sexual relationship with anyone else during that time. The baby was born November 18, 1987, thus, conception took place sometime around the month of March, 1987. Pattie stated that neither she nor Milton *931 used birth control, and that they discussed the possibility of pregnancy.
She testified that she told Milton about the pregnancy, and that she did not want the baby because Milton had a wife and family. Milton agreed to give her money for an abortion, and he did so. Pattie found out that the stage of her pregnancy prevented her from having an abortion. Subsequently, she and Milton discussed putting the baby up for adoption. On cross-examination, Pattie denied having had relationships with other named men, and also denied having told people that another named man was M’s father.
Pattie’s grandmother, Eunice Taylor, with whom Pattie lived for a while, generally corroborated Pattie’s testimony. On cross examination, Eunice Taylor affirmed that Pat-tie had never been married and mothered two other children in addition to M, whose paternity is at issue in the instant case.
Milton testified that he had sexual intercourse only once with Pattie, near the beginning of July, 1987, which is three or four months prior to the child’s birth. Milton admits that he gave Pattie $250 for an abortion around August, 1987. However, he stated that at the time, August, he did so because he believed that Pattie was only around one month pregnant. He believed that because he stated that they had sex only once, near the beginning of July, when he saw no signs of pregnancy. Since at that time she was actually four or five months pregnant, Milton claims that he cannot possibly be the father.
Milton also testified that he saw other men with Pattie during June and July of 1987, and indicated that he believed that she had sexual relationships with one or more of them.
Dr. Durkee explained the results of blood testing conducted by her lab on blood samples from Pattie, “M,” and Milton. The results indicate that Milton is 22,473,773 times more likely to be the biological father than a man randomly selected from the black population of North America. This is an approximate 99.99% probability that Milton is the father.
The following jury instructions which were given are pertinent to this appeal:
The Court instructs the jury that the results of the blood tests performed on the mother, child and Defendant are not conclusive of the issue of paternity and the weight which should be accorded these results is a matter to be determined by the jury.
Instruction No. 1; D-2.
The Court instructs the jury that the results of the blood tests performed on the mother, child and Defendant are not conclusive of the issue of paternity and merely establish that out of the black male population it is biologically possible for the Defendant to be the father.
Instruction No. 2; D-4.
The Court instructs the jury that in order to find for the Plaintiff the jury must find, independently of the probability of paternity indicated by the blood test results, that the mother and the Defendant had sexual intercourse during the period of probable conception and if you do not so find, you must return a verdict for the Defendant.
Instruction No. 3; D-6.
Another occurrence at trial, which was not stenographically recorded, was the presence of the alternate juror during deliberations. The jury was polled after the verdict announcement. The jury verdict in favor of Moore was based on agreement of five (5) out of the six (6) jurors; the sixth juror was undecided. The alternate juror was present in the jury room during deliberation without the parties’ attorneys’ knowledge. This fact was disclosed in open court after the verdict was announced. The bailiff reported that the alternate juror did not participate in the jurors’ deliberation. This matter was preserved in the record pursuant to Mississippi Supreme Court Rule 10(c).
LAW
I.
DID THE TRIAL COURT ERR IN INSTRUCTING THE JURY THAT THE BLOOD TEST RESULTS WERE NOT CONCLUSIVE AND WERE A MERE POSSIBILITY OF PATERNITY?
We begin with Chisolm v. Eakes, 573 So.2d 764 (Miss.1990). In Chisolm, the ex *932 pert testified that the tests showed a probability of 99.59649% paternity. Chisolm, 573 So.2d at 765. This Court, discussing whether such high probabilities were sufficient to sustain a j.n.o.v., stated that the general rule is that these results are admissible, “but not necessarily conclusive.” Id. Because Chi-solm states that these tests are not necessarily conclusive, we realize that the tests indicate a probability which the jury should take into account. Such evidence should be considered by the jury, but the probability which it indicates should not be clouded. That is, as Chisolm holds that such evidence should not be credited as legally conclusive of paternity, it should also not be discredited by jury instructions.
Applying this reasoning to the instant case, the jury instruction was improper. In this case, the court instructed the jury that the blood tests were “not conclusive of the issue of paternity and merely establish that out of the black male population it is biologically possible for the Defendant to be the father.” (Emphasis added). Instructing the jury that the test results were not conclusive was correct. Otherwise, no jury verdict would be necessary.
However, to instruct the jury that the tests meant that paternity was a biological possibility was incorrect. This language tends to discredit the evidence at issue, because it tells the jury to ignore the probability which the evidence presented. The effect of the instruction was to discredit the potential weight these tests would have had- in the minds of the jurors. It reduces the numerical probability presented by the evidence to the general proposition that Moore’s probability of paternity is the same as that of a randomly selected black male. Hence, in this case, the expert stated that paternity here was not merely probable, but 99.99% probable. Where a numerical probability is properly offered into evidence, the jury should not be led to replace the statistical probability with a mere possibility.
That potential weight of this evidence in the jurors’ minds was greatly restricted by the jury instruction. The 99.99% probability was reduced to a mere possibility. Therefore, this assignment of error is sufficient cause to reverse and remand for a new trial.
II.
DID THE TRIAL COURT ERR IN GRANTING JURY INSTRUCTION D-6?
Jury instruction D-6 read as follows:
The Court instructs the jury that in order to find for the Plaintiff the jury must find, independently of the probability of paternity indicated by the blood test results, that the mother and the Defendant had sexual intercourse during the period of probable conception and if you do not so find, you must return a verdict for the Defendant.
Instruction D-6 told the jury that it would have to find that the couple had sexual intercourse without regard to the test results, or, that the tests could not be a factor in their conclusion on this question of fact.
In light of Chisolm, cited above, such test results should not be conclusive of whether the couple had sex or not. Therefore, such test results, standing alone, are insufficient to prove this element of a paternity claim. There must be some other proof or testimony of impregnation.
However, test results of this nature, though not conclusive, should nevertheless be a factor in determining whether they had sexual intercourse or not.
The test results here give a numerical probability of paternity. They tend to make the existence of the fact that Milton had sexual intercourse with Pattie during the conception period more probable. Therefore this evidence was relevant to whether sexual intercourse took place during the period of possible conception. M.R.E. 401.
This error is sufficient to warrant a reversal and remand for a new trial; the reason is that this instruction directed the jury to ignore potentially forceful evidence relevant to the issue of paternity.
This jury instruction, too, is cause to reverse.
*933 III.
DID THE TRIAL COURT ERR IN OVERRULING DHS’ OBJECTION TO TESTIMONY ON THE MOTHER’S RELATIONSHIPS WITH OTHER MEN BECAUSE IT WAS PREJUDICIAL AND/OR IMPROPER CHARACTER EVIDENCE?
Though it is true that Milton’s attorney’s questions and statements can be construed to indicate that Pattie had relationships with other men beyond the period of possible conception, much of the actual testimony dealt with this time period. DHS contends that references to Pattie’s relationships with other men and the fact that she had two illegitimate children were irrelevant to the paternity issue and improper character evidence. Hence the Mississippi Rules of Evidence exclude the references. DHS cites authority from other jurisdictions on this issue. Apparently, relationships outside the period of possible conception would be inadmissible under the Rules of Evidence. See State of North Carolina ex rel. Williams v. Coppedge, 332 N.C. 654, 422 S.E.2d 691 (1992) (with reference to same case, 414 S.E.2d 81) (discussing admissibility of mother’s promiscuous reputation to refute her testimony that she had exclusive relationship with alleged father during time of conception). Relations outside that time period are irrelevant to the issue of paternity, and are improper character evidence; they are inadmissible. South Carolina Department of Social Servs. v. Brown, 272 S.C. 568, 253 S.E.2d 100 (1979) (evidence of mother’s sexual history not connected with period of conception held inadmissible); Cornish v. Smith, 97 Idaho 89, 540 P.2d 274 (1975) (alleged father’s failure to show relevance of mother’s promiscuous reputation to paternity issue held inadmissible). Compare, Crum v. Brock, 136 Miss. 858, 101 So. 704 (1924).
Though the rules of evidence would exclude evidence concerning Pattie’s relationships with other men outside the window of possible conception, this area of inquiry at trial was not properly preserved by objections. M.R.E. 103(a), Anderson v. Jaeger, 317 So.2d 902, 907 (Miss.1975).
IV.
DID THE TRIAL COURT ERR IN OVERRULING DHS’ OBJECTION TO DEFENDANT’S COUNSEL’S STATEMENTS THAT THE MOTHER WAS UNMARRIED AND HAD ILLEGITIMATE CHILDREN?
During closing argument, DHS objected to Milton’s attorney’s statement that Pattie had illegitimate children other than M; the trial judge overruled the objection. As in the previous issue, these possible errors were not preserved for appeal, because the questions were not objected to, and the attorney’s statements were based on evidence already admitted without prior objection. As stated in the previous issue’s discussion, objections must be made at the time offered in order to object to evidence via appeal. M.R.E. 103(a)(1), Anderson v. Jaeger, 317 So.2d 902, 907 (Miss.1975) (timely objection necessary to preserve issue for appeal, it is too late to raise issue for first time in motion for new trial); Johnson v. Fargo, 604 So.2d 306 (Miss.1992). Therefore, as to the testimony concerning Pattie’s illegitimate children, we cannot provide a remedy, because no objection was made.
However, the attorney further told the jurors to remember this when “weighing her [Pattie’s] testimony,” and that Pattie did not get those children by simply staying home. Therefore, we review this evidentiary matter to clarify the fact that such statements and evidence were improper.
It is true that references to Pattie’s marital status and illegitimate children were clearly irrelevant. M.R.E. 401. These statements are also of the nature of an attack on Pattie’s character and were potentially prejudicial, thus potentially invoking the character evidence rules and Rule 403, which excludes relevant evidence when the prejudicial effect substantially outweighs the probative value.
Nevertheless, it is sufficient to cite Rule 401. References to Pattie’s marital status and illegitimate children had no probative value. The issue was whether Milton was the father of M. These references had no tendency to make the proposition that Milton *934 was the child’s father any more or less probable than without the evidence.
V.
WAS THE ALTERNATE JUROR’S PRESENCE DURING JURY DELIBERATION REVERSIBLE ERROR?
The mere presence of the alternate juror without showing that the deliberation was even affected by it, does not constitute reversible error. Luster v. State, 515 So.2d 1177, 1179 (Miss.1987) (harmless error found in criminal case, where no prejudice is shown to have been caused by the presence of both alternate jurors during deliberation). However, courts should be mindful of the potential prejudice and future issues which such a defect can cause, and therefore, should practice prevention.
We take this opportunity to remind the trial courts that the law states that alternate jurors may replace a juror only prior to the time the jury retires to deliberate. Rule 47(d), M.R.C.P., and Miss.Code Ann. § 13-5-67 (Supp.1992). The alternate juror(s) must be discharged as soon as the jury retires to deliberate. Balfour v. State, 598 So.2d 731, 755 (Miss.1992), Folk v. State, 576 So.2d 1243, 1251 (Miss.1991).
CONCLUSION
Because the jurors’ weighing of the evidence was affected by the improper jury instructions, and DHS properly moved for a new trial, we reverse and remand for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
HAWKINS, C.J., PRATHER, P.J., PITTMAN, BANKS, JAMES L. ROBERTS Jr., and SMITH, JJ., concur.