## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 96-CA-00509-SCT

*IN THE MATTER OF THE ESTATE OF VINCENT
CHAMBERS, DECEASED: ANGELLA BROWN,
INDIVIDUALLY AND AS MOTHER AND NEXT
FRIEND OF SHABAZ MONET BROWN, A MINOR*

*v.*

*EDNA CHAMBERS JACKSON, ADMINISTRATRIX
OF THE ESTATE OF VINCENT CHAMBERS,
DECEASED, AND LEE MONROE, SR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/30/96 |
| TRIAL JUDGE: | HON. HYDE RUST JENKINS II |
| COURT FROM WHICH APPEALED: | JEFFERSON COUNTY |
| | CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | SORIE S. TARAWALLY |
| ATTORNEYS FOR APPELLEES: | WILLIAM RILEY |
| | LEONARD MELVIN |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| DISPOSITION: | REVERSED AND REMANDED - 5/14/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/4/98 |

**BEFORE SULLIVAN, P.J., BANKS AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. Edna Chambers Jackson as administratrix obtained a wrongful death settlement for the death of her son, Vincent Chambers. She then filed a complaint in Jefferson County Chancery Court to determine Chambers' heirs at law. Angella Brown, as mother and next friend of her infant child, Shabaz Monet Brown, came forth claiming that Chambers was Shabaz's biological father. On April 3, 1996, the Jefferson County Chancery Court dismissed Brown's paternity claim with prejudice. Aggrieved, Brown appeals to this Court assigning as error the following issues:

### I. WHETHER THE TRIAL COURT ERRED IN ALLOWING TESTIMONY OF

**WITNESSES WHOSE ADDRESSES HAD NOT BEEN FURNISHED TO BROWN DURING DISCOVERY.**

**II. WHETHER THE TRIAL COURT ERRED IN DISREGARDING BROWN'S EXPERT WITNESS'S PATERNITY TESTS.**

**III. WHETHER THE TRIAL COURT ERRED IN ALLOWING WITNESSES WHO WERE IN THE COURTROOM AFTER "THE RULE" WAS INVOKED, TO TESTIFY.**

**IV. WHETHER THE TRIAL COURT ERRED BY ADMITTING IMPROPER CHARACTER EVIDENCE.**

## STATEMENT OF THE FACTS

¶2. Angella Brown met Vincent Chambers in March of 1992. Angella and Vincent engaged in two acts of sexual intercourse, once in April 1992, and once in late May or early June 1992. Shabaz Monet Brown was born February 27, 1993.

¶3. Angella testified that during the conception period she was also having sex with Emmanuel Tenner. However, she claims that she had a menstrual period after her last act of intercourse with Tenner and before her second act of intercourse with Chambers. Angella asserts that she did not have sex with anyone else during the conception period. Three gentlemen, Rezon King, Robert Anderson, and Jelemiles Anderson, refuted Angella's testimony and stated that they had sex with her during the conception period. Each of these paramours declined blood tests to determine paternity.

¶4. Angella gave Shabaz her own last name. Shabaz's birth certificate lists her father as unknown. Angella also, at one point, when applying for help from the Department of Human Services, signed an affidavit stating that Tenner was Shabaz's father. Subsequent blood tests excluded Tenner as the sperm donor. Angella claims that on two other occasions she told the Department of Human Services that Chambers was Shabaz's father.

¶5. According to Angella she called Chambers when she learned of her pregnancy. He responded to his possible parental responsibilities by advising her: "Don't call me. This is shit." She also asserted that shortly after Shabaz was born, she saw Chambers at a club and he inquired about the child. Angella testified that after Chambers died, she took the baby to see Chambers' mother, Edna. She told Edna that Shabaz was Chambers' daughter. Edna admitted that Angella brought Shabaz to see her, but contended that it was a brief visit and that Angella did not indicate that Chambers was the child's father. Angella further testified that Edna gave her $40.00 to spend on behalf of the baby. Edna concedes that she gave Angella $40.00, but claims that it was for Angella, not for the child.

¶6. Dr. Roy Scales, owner of a paternity testing laboratory, testified that there was a 98.63 percent chance that Chambers was Shabaz's biological father. Dr. Scales based his testimony on records from blood drawn from Chambers on May 7, 1974, and reports from a doctor's office where Chambers had been treated as recently as 1985. He stated that according to his tests, the "odds" were 72.03 to 1 that Chambers was Shabaz's father. However, when asked if it was his opinion that Chambers was Shabaz's father, Dr. Scales replied that he would not render an opinion. He stated that he could only

say that probability favors Chambers' paternity. During cross-examination, Dr. Scales conceded that, given certain facts Edna's attorney asked him to consider, the probability that Chambers was the father could be as low as 88.89 percent.

¶7. Dr. Scales also testified that the fact that Chambers was diagnosed with sickle cell anemia increased the probability that he was Shabaz's father. Shabaz was also a carrier of sickle cell anemia, and Angella tested negative for the disease.

## STANDARD OF REVIEW

¶8. When reviewing a chancellor's decision this Court will accept the chancellor's finding of fact as long as the evidence in the record reasonably supports those findings. *Perkins v. Thompson*, 609 So.2d 390, 393 (Miss. 1992). In other words, we will not disturb the findings of a chancellor unless those findings are clearly erroneous or an erroneous legal standard was applied. *Hill v. Southeastern Floor Covering Co.*, 596 So.2d 874, 877 (Miss.1992). Where the factual findings of the chancellor are supported by substantial credible evidence, they are insulated from disturbance on appellate review. *Jones v. Jones*, 532 So.2d 574, 581 (Miss.1988) (*citing* *Norris v. Norris*, 498 So.2d 809, 814 (Miss.1986); *Carr v. Carr*, 480 So.2d 1120, 1122 (Miss.1985)).

### I. WHETHER THE TRIAL COURT ERRED IN ALLOWING TESTIMONY BY WITNESSES WHOSE ADDRESSES HAD NOT BEEN FURNISHED TO BROWN DURING DISCOVERY.

¶9. Three witnesses, Rezon King, Robert Anderson, and Jelemiles Anderson, testified that they had each had sex with Angella during the conception period. King is Edna Jackson's nephew and Robert and Jelemiles Anderson are brothers and were friends of Chambers. Edna did not provide Angella with the addresses of any of these witnesses during discovery. Each responded negatively when Angella's attorney asked them if they would submit to a blood test. Mississippi Code Annotated § 93-9-21 in effect at the time of trial provided:

> (1) The court , on its own motion or on motion of the plaintiff or the defendant, shall order the mother, the alleged father and the child or children to submit to blood tests and any other tests which reasonably prove or disprove the probability of paternity.
>
> If any **party** refuses to submit to such tests, the court may resolve the issue of paternity against such party or enforce its order if the rights of others and the interest of justice so require.
>
> (2)Any party calling a witness or witnesses for the purpose of testifying that they had sexual intercourse with the mother at any possible time of conception shall provide all other parties with the name and address of the witness twenty (20) days before the trial. If a witness is produced at the hearing for the purpose stated in this subsection but the party calling the witness failed to provide the twenty-day notice, the court may adjourn the proceeding for the purpose of taking a blood or other test of the witness prior to hearing the testimony of the witness if the court finds that the party calling the witness acted in good faith.
>
> (3)The **court shall ensure** that all parties are aware of their right to request blood or other tests under this section.

Miss. Code Ann. § 93-9-21 (1994) (emphasis added).

¶10. The statute envisions two types of witnesses: a party witness and a non-party witness. The statute does not instill the court with the power to compel a non-party witness to take a blood test, though it may be requested by the court. A person's right to privacy is a fundamental right guaranteed under the United States Constitution. Nevertheless, a person's right to privacy can be overcome when the State has a compelling interest. *Winston v. Lee*, 470 U.S. 753, 760 (1985). Determining a child's parentage is a compelling state interest, and thus, according to the statute, a court can order a party witness to submit to a blood test. To the contrary, substantiating a non-party witness's testimony is not a compelling state interest. We have previously held that having a person available as a witness is not so compelling as to allow governmental interference with a person's right to privacy. *In re Brown*, 478 So.2d 1033, 1041 (Miss. 1985). Therefore, if the court requests that a non-party witness take a blood test and the witness refuses, then the court's only option under the statute would be to exclude the testimony of that witness.

¶11. The statute does not mandate that a non-party witness be excluded for refusing to undergo a blood test. However, the purpose of the statute is to give an adverse party notice twenty days prior to trial. Failure to comply with the statute must have a remedy. Violation of the statute not in good faith dictates exclusion of the witness. If the violation is in good faith, the court shall request blood tests in lieu of excluding the witness. The intent of this statute is to reach the truth, not only for the parties, but for the state while balancing the individual's privacy rights against interests of the state and the child to determine parentage. To give meaning to the statute, the court must have authority to exclude a non-party witness from testifying if he refuses to take a blood test. This remedy strikes a reasonable balance between competing interests.

¶12. Angella's attorney was derelict in failing to direct the chancellor's attention to this statute. When Rezon, Robert, and Jelemiles told Angella's attorney that they would not submit to blood tests, he should have moved to have their testimony excluded. Nevertheless, the real error lies with the Chancellor for failing to request that the three witnesses submit to blood tests or have their testimony stricken. Indeed, as soon as each of these witnesses testified that he could be the putative father, the Chancellor should have requested that each beau take a blood test and excluded the testimony of any suitor who declined. The statute clearly places the responsibility upon the Chancellor to "ensure" that all parties are aware of their right to request tests. The Chancellor's failure to do so was an abuse of discretion and this case must be reversed and remanded on this issue.

¶13. We have held that, "Public policy dictates that a determination of paternity is in a child's best interest. Protection of a child's best interest is a goal which this Court considers to be of utmost import..." *Department of Human Servs. v. Smith*, 627 So.2d 352, 353 (Miss. 1993). In this case, Shabaz deserves to know the identity of her biological father. If it is necessary to exhume Chambers' body to conduct DNA tests and positively determine whether or not he is the father, then the Chancellor shall order the body exhumed and assess costs to the prevailing party.

## II. WHETHER THE TRIAL COURT ERRED WHEN THE COURT DISREGARDED THE TESTIMONY OF ANGELA'S EXPERT WITNESS'S PATERNITY TESTS.

¶14. Angella's expert, Dr. Scales, testified that there is a 98.63 chance that Chambers was Shabaz's father. He also stated that the "odds" were 72 to 1 that Chambers was the father. He based his tests

on Chambers' birth records and medical records of his treatment for sickle cell anemia. Based on the information available to Scales, he said that he could not provide a more exact number. When asked by the court if it was his professional opinion that Chambers was the father, he stated:

> I'm just uncomfortable saying in my personal, in my professional opinion this man is the father of this child. I think the balance, the evidence on balance certainly is pre DNA, maybe 15 or 20 years ago 72 was a pretty good number. Now it is not. No, that is not true. It is just not as powerful as if we'd had a lot of genetic systems we could have tested. ... We just say he can't be excluded. That is a hedge because you can never prove with 100%.

Dr. Scales proceeded to testify that he would only opine that Chambers was the father if the odds were 400 or 500 to 1 that he was the father. The Chancellor was troubled by this testimony, and stated that if Angella's own expert could not state that it was his opinion that Chambers was the father, then the proof fell short of the clear and convincing evidence standard required by Mississippi Code Annotated § 91-1-15(c). The Chancellor failed to realize that it is common for experts in paternity cases to refuse to render an opinion. Instead, the expert gives the probability that paternity is likely. *See **Grimsley v. Tyner***, 454 So.2d 482 (Miss. 1984).

¶15. The Chancellor also failed to address Miss. Code Ann. § 93-9-27(2), which states that if the probability of paternity is 98 percent or higher that a man is the father, then there is a rebuttable presumption that he is the father. In this case, Dr. Scales testified that the probability of paternity was 98.63%. This presumption can only be rebutted by a preponderance of the evidence. Miss. Code Ann. § 93-9-27(2)(1994). The Chancellor was remiss in not considering the statutory presumption, nor does it appear that Jackson overcame this presumption. The Chancellor should reevaluate his assessment of Dr. Scales' testimony in light of the presumption set forth in Mississippi Code Annotated § 93-9-27(2) and the results of any blood tests conducted on King, and the brothers Anderson.

### III. WHETHER THE TRIAL COURT ERRED BY ALLOWING TESTIMONY OF WITNESSES WHO WERE PRESENT IN THE COURTROOM AFTER "THE RULE" WAS INVOKED.

¶16. Mississippi Rule of Evidence 615, also known in Mississippi as "The Rule", provides that if a party requests that witnesses be excluded from the courtroom, the judge shall order that they be excluded. The purpose of the rule is to prevent witnesses from hearing the testimony of other witnesses. In the case *sub judice*, the rule was invoked after opening statements. Angella now claims that because Rezon King, Robert Anderson, and Jelemiles Anderson were in the courtroom prior to their testimony that their testimony should be excluded. King and the Andersons were in the courtroom on the second day of the trial and they were present while the attorneys argued several motions. King and the Andersons proceeded to testify, and Angella's attorney objected claiming that the rule had been violated.

¶17. The decision to exclude the offending witness in a Rule 615 violation is discretionary with the trial court. ***Johnson v. State***, 346 So.2d 927, 930 (Miss. 1977). The Chancellor should not allow the offending witness to testify if he determines that the witness will be prejudiced by the testimony that he has already heard. In the case *sub judice*, the Chancellor stated that the witnesses in the court room were not prejudiced by the testimony that they heard. He noted that testimony was not

discussed in their presence and that they only heard discussions regarding the burden of proof and the documents used by Angella's expert. Finding that the witnesses were not prejudiced, the Chancellor held that their testimony should not be excluded because the rule was violated. We agree with the learned Chancellor and find no merit in this assignment of error.

## IV. WHETHER OR NOT THE TRIAL COURT ERRED BY ADMITTING IMPROPER CHARACTER EVIDENCE.

¶18. Angella also alleges that inadmissible character evidence regarding her sexual activities was admitted in violation of Mississippi Rule of Evidence 608, which prohibits character evidence. Specifically, Angella refers to the fact that Edna's attorney on two occasions referred to Brown as "pretty close to being a prostitute." He also implied that Angella committed a crime by engaging in sex with Chambers, who, at 17, was still a minor at the time of their liaison. Further, Angella alleges that the attorney purposely used irrelevant evidence to embarrass her. She is particularly offended by a line of questio~ing in which he questioned her about her relationship with Tenner, who had been excluded as the potential father. During this questioning the lawyer inquired as to how often she and Tenner had sex and was curious as to whether or not he ejaculated inside of her. The trial attorney's diddling fascination with Tenner's excretory functions was not only in bad taste, but irrelevant and the Chancellor should not have allowed it.

¶19. Mississippi Rule of Evidence 608 states that character evidence may not be admitted except when the evidence refers to a witness's character for truthfulness or untruthfulness. In the case *sub judice*, the defense counsel sought refuge for his client behind that time-honored bastion of philanderers, "exceptio pluriam concubentium", or the plea of several lovers. When he attempted to introduce evidence regarding Angella's numerous sexual partners, her attorney objected and the defense counsel endeavored to convince the Chancellor that Angella was "close to being a prostitute" and that the fact that she may have had sexual relations with many men reflected on her credibility. The Chancellor correctly rejected the proposition that sexual habits indicate whether or not a person is truthful and stated that the defense counsel could only delve into her sexual relationships from a few months before the conception through the entire term of her pregnancy. The Chancellor did not sufficiently narrow the scope of questioning regarding Angella's sexual habits. We have previously held that evidence of sexual relationships outside the period of possible conception are inadmissible in a paternity context under the rules of evidence. *Department of Human Servs. v. Moore*, 632 So.2d 929, 933 (Miss. 1994).

¶20. The defense counsel also interrogated Angella about sexual relations she had had with messieurs Cedric Sims and Donnie Mitchell. However, he did not allege that she had sex with either of these men during the period of conception. Further, Angella maintains that the only two men she had sex with during the period of conception were Tenner and Chambers. Thus, while the salacious testimony regarding Sims and Mitchell may have been titillating, the Chancellor erred when he allowed the defense counsel to question Angella about her sexual relations with these men.

¶21. The Chancellor further erred in allowing the defense counsel to question Angella about her sexual relationship with Tenner. Tenner was excluded as Shabaz's father. Therefore, questions about her sexual relationship with him were irrelevant as to the issue of paternity and were inadmissible as character evidence.

¶22. Finally, the question of Angella committing a crime by having sex with a minor was inadmissible. Mississippi Rule of Evidence 609 states that evidence that a witness was convicted of a crime may be elicited on cross examination if that crime meets certain specifications. In the case *sub judice*, Angella has not been convicted of any crime. Thus, evidence that she committed a crime was inadmissible as character evidence, and the Chancellor properly sustained Angella's attorney's objection to this question.

## CONCLUSION

¶23. We find that the Chancellor committed reversible error regarding issues I, II, and IV. The Chancellor should have informed Angella Brown of her right to have Rezon King, Robert Anderson, and Jelemiles Anderson submit to blood tests or have their testimony excluded. Further, the Chancellor should reevaluate the testimony of Dr. Scales in light of the statutory presumption and the possible blood tests of Rezon King, Robert Anderson, and Jelemiles Anderson.

¶24. Upon rehearing, the Chancellor should not allow any testimony about the sexual relations of Angella except for proof of sexual activity which occurred around the time of conception with men who are not excluded as Shabaz's father.

¶25. **REVERSED AND REMANDED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, SMITH AND WALLER, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**