# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 97-CA-00634-COA

**GREYHOUND LINES, INC.**                                                                    **APPELLANT**

**v.**

**GERALD SUTTON, ADMINISTRATOR OF THE ESTATE OF NICHOLAS MAY, DECEASED; GERALD SUTTON, ADMINISTRATOR OF THE ESTATE OF SUMONE MAY, DECEASED; DONNIE CAUGHMAN, ADMINISTRATOR OF THE ESTATE OF MARCUS MAY, DECEASED; ESTATE OF CHERYL MAY; NANCY BONANNO; PAUL COTTER; AND ROBERT RILEY**                                                                    **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/18/1997 |
| TRIAL JUDGE: | HON. J. LARRY BUFFINGTON |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | LUTHER T. MUNFORD |
| | REGINALD ARTHUR GRAY III |
| | REBECCA L. WIGGINS |
| ATTORNEYS FOR APPELLEES: | KEITH M. ALEXANDER |
| | F. DOUGLAS MONTAGUE III |
| | CRYMES G. PITTMAN |
| | DAVID SHOEMAKE |
| | C. VICTOR WELSH III |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| TRIAL COURT DISPOSITION: | $1.1 MILLION IN FAVOR OF ESTATES OF MARCUS MAY, NICHOLAS MAY AND SUMONE MAY; $680,000 DAMAGES IN FAVOR OF NANCY BONANNO |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART - 06/29/99 |
| MOTION FOR REHEARING FILED: | 07/27/99 - DENIED, CONCURRING OPINION MODIFIED - 12/07/99 |
| CERTIORARI FILED: | granted 3/16/2000 |
| MANDATE ISSUED: | |

BEFORE THOMAS, P.J., PAYNE, AND SOUTHWICK, JJ.

THOMAS, P.J., FOR THE COURT:

¶1. Greyhound Lines, Inc. appeals the judgment of the chancery court, raising the following issues as error:

**I. THE CHANCELLOR'S ASSIGNMENT OF ANY FAULT TO GREYHOUND WAS MANIFESTLY ERRONEOUS.**

**II. THE CHANCELLOR MANIFESTLY ERRED IN ASSESSING DAMAGES AND REFUSING TO REMIT DAMAGES AWARDED.**

¶2. We affirm in part and reverse and remand in part.

## FACTS

¶3. On the night of January 22, 1995, Cheryl May drove through a stop sign on Old Hebron Road in Jefferson Davis County and slammed into a Greyhound bus traveling north on State Highway 13. The right front of May's car collided with the left front of the bus. The collision instantaneously killed May and her three children, Marcus, eight, Sumone, three, and Nicholas, one. The impact knocked the bus off the highway and into a ditch, injuring the driver, three passengers, and destroying the bus.

¶4. On July 21, 1995, Gerald Sutton, the statutory beneficiary of Nicholas and Sumone and administrator of their estates, and Donnie Caughman, administrator of the estate of Marcus, filed suit for civil damages against May's estate and Greyhound. Greyhound cross-claimed for property damage to its bus against May's estate. May's estate filed a cross-claim against Greyhound for compensatory damages arising out of the wrongful death of May. Nancy Bonanno, Paul Cotter, and Robert Riley, all passengers on the bus, eventually intervened filing their own suit against May's estate and Greyhound. All actions were tried before the Chancery Court of Simpson County on February 10, 1997.

¶5. On March 6, 1997, the chancellor entered his opinion and order. The chancellor found Greyhound 10% at fault for the accident, and May 90% at fault. On the issue of damages, the chancellor awarded for the death of Marcus, Nicholas, and Sumone, a judgment in the amount of $1.1 million for each. Bonanno was awarded $680,000, Riley was awarded $285,000, and Cotter was awarded $50,000. From this order, this appeal ensued.

## ANALYSIS

## I.

### THE CHANCELLOR'S ASSIGNMENT OF ANY FAULT TO GREYHOUND WAS MANIFESTLY ERRONEOUS.

¶6. Greyhound assigns several errors to the chancellor's decision to hold Greyhound 10% at fault for the accident. First, Greyhound asserts that the chancellor was manifestly in error in finding that the bus was traveling 56 mph. Second, Greyhound asserts that the chancellor's finding that Greyhound's driver had sufficient notice to brake in time to prevent the accident was also manifestly erroneous. Greyhound argues that both these errors require us to reverse and render the judgment as to liability. Finally, Greyhound maintains that the failure to brake theory was neither raised nor tried by the parties. Greyhound argues that even if we were not to reverse and render the judgment as to liability, a new trial should be ordered as to allow Greyhound an opportunity to contest the theory on which the chancellor's decision ultimately relied.

¶7. Our standard of review when examining findings of fact made by the chancellor is extremely limited. Our supreme court has articulated the standard as follows:

> The standard of review applied to findings of a chancellor is a familiar one. This Court will not disturb those findings unless manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. *Hill v. Southeastern Floor Covering Company*, 596 So. 2d 874 (Miss. 1992). Reversal is permitted only in those cases where the chancellor was manifestly in error in his finding of fact and manifestly abused his discretion. *Powers v. Powers*, 568 So. 2d 255, 257-58 (Miss. 1990). Where the factual findings of the chancellor are supported by substantial credible evidence, they are insulated from disturbance on appellate review. *Jones v. Jones*, 532 So. 2d 574, 581 (Miss. 1988) (quoting *Norris v. Norris*, 498 So. 2d 809, 814 (Miss. 1986); *Carr v. Carr*, 480 So. 2d 1120, 1122 (Miss.1985)).

*McAdory v. McAdory*, 608 So. 2d 695, 699 (Miss. 1992).

¶8. The chancellor's opinion and order regarding liability reads as follows:

> This was an accident in which the unrebutted testimony by the experts was that the defendant, Cheryl May, failed to stop or yield the right-of-way to the oncoming traffic. Once viewed in that fact the Court then has to look and see whether there was any contributory negligence on behalf of the Greyhound bus driver or whether the sole and approximate cause of the accident was the actions of the defendant, Cheryl May. In looking at whether there was any contributory or comparative negligence the Court has heard the testimony of three accident reconstructionists, none of whom seem to agree on exactly what happened or the speed of the vehicles involved. The plaintiff's expert using a formula that took into account crash damage stated that the vehicles were going 70 miles per hour for the bus and 24 miles per hour for the automobile. The accident reconstructionist for the Mississippi Highway Patrol stated that the bus was going 53 miles per hour and the vehicle was traveling at 35 miles per hour. The reconstructionist for the bus company, while not giving an exact amount of speed by either vehicle, felt that the vehicles were going approximately what the highway patrol investigation came up with. There were, however, differences in what he said occurred and what the reconstructionist for the highway patrol stated in that his investigation shows that there was no braking prior to impact and the only braking was after impact and the highway patrol investigation showed a braking of approximately 15 feet prior to impact. He also testified that there were dig marks and tree limbs that were down as well as running into a creek that he testified would in fact alter the formula that was used by the Mississippi Highway Patrol. This Court feels that the bus was probably traveling at a rate in excess of 53 miles per hour that was given by the Mississippi Highway Patrol and in making that conclusion has based the findings on the fact that the slide to stop method used by them did not take into consideration any of the terrain or the digging in by the bus in the land once it had left the roadway. The Court further recognizes that it would be impossible to use the slide to stop method if the reconstructionist was required to determine the compaction of the soil as well as the other factors that are presented on the landscape. The Court, however, is not satisfied that the vehicle was going at a speed of 70 miles per hour as alleged by the reconstructionist for the plaintiffs and, in fact, feels that the bus was going somewhat less than the 70 miles per hour as testified to. The Court, however, has heard testimony from the other passengers that testified at the trial as to the speed of the bus and although none could give a speed there was testimony that on some stretch of the highway the bus had passed two vehicles and the bus driver's own testimony at the time of the wreck to the

highway patrol officer that was first on the scene that he was traveling 56 miles an hour which would be in excess of what the reconstructionist for the highway patrol said was the speed and therefore feels that the bus driver was traveling in excess of the posted speed limit at the time of the accident. Next the Court has to look at whether this speed contributed to the accident in question and looking solely at the excess speed over the legally posted speed limit by itself would not have probably negated or made the accident less deadly. The Court, however, heard testimony as to the conditions that were present at the time of the accident and the testimony was that there was no vehicles in front and no vehicles behind that would have been diverting the attention of the driver. The testimony, however, of the passengers testifying for and on behalf of the defendant, Greyhound Bus Lines, was that he saw the vehicle entering the intersection and hollered twice prior to the bus driver reacting to his yells. This happened by a passenger who was approximately halfway back in the bus which was some 25 to 30 feet behind the driver and was sitting on the opposite side of the bus from the driver. Since the bus driver had no other vehicles to be concerned with and, in fact, the highway was properly marked with a sign informing him of an intersection ahead then the Court has to look at whether the inattention or failure to keep a proper look out for vehicles entering the intersection was a contributing factor to the accident.

The testimony of the expert witness for Greyhound Bus Lines was that a car traveling at 24 miles per hour would travel 30 feet in one second and one traveling at 35 miles per hour would travel approximately 40 feet in one second and that a bus traveling at 55 miles per hour would need 8 seconds to stop or said bus would take 231 feet to come to a complete stop. The passenger stated that it was approximately 5 seconds between the time he saw the vehicle and the collision occurred. If the bus driver had only seen the vehicle at the time the passenger saw the vehicle entering the intersection he could have applied the brakes and since the vehicles hit at the corners of the two bumpers, the vehicle driven by Cheryl May would have needed less than one second to have cleared the intersection and the driver could have applied his brakes and the vehicle could have cleared the intersection. Given the fact that the bus driver's own admission was that he was traveling in excess of the posted speed by statute he had an obligation to slow down while approaching an intersection and further he had a duty and obligation to keep a proper look out [sic] and to take whatever actions could be taken to avoid an accident. His inattention to the approaching intersection when there was nothing else to distract or otherwise have his attention was a contributing factor to this accident and the Court assesses Cheryl May's fault at ninety percent and Greyhound Bus Lines fault at ten percent.

¶9. Greyhound contends that the chancellor's finding that the bus was traveling at 56 mph was manifestly erroneous. Greyhound bases its argument on the fact that the Mississippi Highway Patrol investigation concluded the bus was traveling 53 mph, and Greyhound's own expert concluded the bus was moving in the range of 50 to 55 mph. Greyhound also points to both the testimony of the bus driver who said at trial he was driving at 55 mph, and Jackie Wayne Weaver, a passenger on the bus, who testified the bus was not speeding. Greyhound also maintains the chancellor's reasons for rejecting this evidence does not withstand scrutiny as either it is false, irrelevant, or will not support the weight the chancellor put on it.

¶10. The chancellor's ruling that the bus was traveling 56 mph is a finding of fact and will not be disturbed if supported by substantial credible evidence. While the evidence presented to us by Greyhound on appeal is reasonable that does not mean the chancellor was required to accept this evidence. It is the chancellor's duty to weigh the evidence at trial for he is the ultimate finder of fact. The plain fact of the matter is that

Greyhound's driver the night of the accident stated he was traveling 56 mph. Greyhound would now have us discredit this statement because it was taken two hours after the accident, at a time the driver was in the hospital, and the driver was never charged with speeding by the officer who took the statement. The fact the chancellor gave more credit or weight to the driver's statement taken shortly after the accident when the driver's memory was fresh as opposed to his statement given at trial was certainly well within the chancellor's prerogative. Also, the fact that the driver was not charged with speeding for a 1 mph violation has little if no bearing on whether or not the bus was traveling 56 mph. Furthermore, the finding of a 56 mph speed for the bus is certainly as close to consistent as one could possibly get with Greyhound's own expert who testified that the bus could possibly be traveling as fast as 55 mph. We certainly understand that in a case such as this a 1 mph variance may make all the difference in the world. However, as Greyhound itself points out, the chancellor did not rely *solely* on the bus's speed to assign fault to Greyhound. In fact the chancellor specifically ruled this out when he stated "the Court has to look at whether this speed contributed to the accident in question and looking solely at the excess speed over the legally posted speed limit by itself would not have probably negated or made the accident less deadly."

¶11. Greyhound next argues that the finding that the bus driver had sufficient notice to brake in time to prevent the accident was manifestly erroneous. Greyhound claims that the chancellor premised his holding on two factual findings, both of which were wrong. Greyhound claims the chancellor was wrong to conclude that there was a sign on Highway 13 that warned of the intersection, and the chancellor was wrong in stating the passenger across the aisle shouted twice five seconds before the accident. In addition, Greyhound argues that the chancellor was manifestly wrong as the substantial evidence points to the fact that any notice that May would run the stop sign was instantaneous with the crash.

¶12. The chancellor's opinion on this issue reads as follows: "Given the fact that the bus driver's own admission was that he was traveling in excess of the posted speed by statute he had an obligation to slow down while approaching an intersection and further he had a duty and obligation to keep a proper look out [sic] and to take whatever actions could be taken to avoid an accident. His inattention to the approaching intersection when there was nothing else to distract or otherwise have his attention was a contributing factor to this accident and the Court assesses Cheryl May's fault at ninety percent and Greyhound Bus Lines fault at ten percent." The chancellor concluded that the bus driver had a duty to slow down as he approached the intersection and to keep a proper lookout, which he breached by speeding at 56 mph as he entered the intersection and further breached by inattentiveness and failure to take appropriate action (brake) to avoid the accident, and that his breach of both these duties was a contributing proximate cause of the accident.

¶13. Provided the chancellor did not apply an erroneous legal standard and that his findings of fact of inattention/failure to brake and proximate cause were supported with substantial credible evidence we will not disturb the chancellor's decision. We should first point out that the chancellor was indeed wrong when he stated that there was a sign warning the bus driver of the impending intersection. The record does not support this, and it is simply not true. However, this fact does not relieve the bus driver of his duty to slow down at that point where he should have reasonably known an intersection was approaching. Miss. Code Ann. § 63-3-505 (Rev. 1996) specifically mandates that a driver of any motor vehicle must decrease speed when approaching and crossing an intersection. Therefore, the chancellor applied that correct legal standard when he held that the driver had a duty to slow down as he approached the intersection.

¶14. We also hold the chancellor applied the proper legal standard in regard to the duty to keep a proper lookout. In *Jobron v. Whatley*, 250 Miss. 792, 168 So. 2d 279, 284 (1964), our supreme court

delineated the proper standard:

> Insofar as the appellee's having the right of way, or the right to assume that the driver of the other car would stop his car before entering the intersection, is concerned, this Court has repeatedly stated what the rule is, namely: That the motorist's right to assume that the driver of a vehicle proceeding toward an intersection will obey the law of the road, which requires him to stop before entering the intersection, exists only until he knows or in the exercise of ordinary care should know otherwise.

¶15. *Jobron* is very similar to the case at bar as it involved a car having the right of way which was hit by a car which ran a stop sign. *Id*. at 280. A passenger in the car that was hit filed suit against both the driver who ran the stop sign and the driver of the car she was in for failing to keep a proper lookout and failing to properly control the car after seeing the other car approaching. *Id.* The trial court in *Jobron* granted a peremptory instruction to the driver of the car the passenger was in because the court felt the passenger failed to make an issue of negligence for the jury. *Id.* Based on the evidence presented, our supreme court held "[c]ertainly it would be a question for the jury to determine, whether or not the appellee was guilty of negligence in failing to use her brakes and slow her vehicle down so that, when it appeared Dr. White was not going to obey the stop sign and bring his vehicle to a stop, she would have had her vehicle under control and would have been able to avoid the collision." *Id*. at 282.

¶16. Turning to the case at bar, the bus driver had both the duty to slow down as he approached the intersection and a duty to brake when and if it became evident May was not going to stop for the intersection. The chancellor applied the correct legal standards. Therefore, we cannot disturb his opinion for any deficiencies with regard to the law. However, the chancellor also made factual findings that the bus driver breached both these duties. To uphold the chancellor's opinion both of these findings of fact must be supported with substantial credible evidence.

¶17. An examination of the record provides the following evidence:

Jackie Wayne Weaver, a passenger on the bus, testified that he was awake and sitting up when the accident occurred. He testified that he could see the headlights of May's vehicle flickering through the trees as it approached the intersection. Weaver further testified that it was no more than five seconds from when he saw the car to impact. Weaver also testified that he yelled out "Oh, sh-!" simultaneously with impact. Weaver's testimony also revealed that he was sitting about half way down the bus on the passenger side and the impact occurred on the front left driver's side of the bus.

Nancy Bonanno, another passenger on the bus, testified that she was trying to sleep while lying on the last row of the bus. Her testimony was that there was a yell, then the bus started to brake, and then impact. Bonanno testified that there was a twenty-second lapse of time between the yell and the brakes, and another thirty seconds between the brakes and impact.

Robert Wayne Riley, another passenger on the bus, testified he was sitting in the middle of the bus on the driver's side. Riley testified that he was talking to two boys on the bus and then decided to lie down. Riley testified that after lying down he heard one of the boys yell out "Oh, sh-!" Upon hearing the yell, Riley said he opened his eyes and went to get up, heard a crash, then brakes, and then he went straight up in the air. Riley further testified that all of this happened over a "possibility of five to eight seconds."

John D. Bryant, Jr., the driver of the bus, testified he did not see May's vehicle prior to impact. Bryant

testified he heard a passenger yell out "[t]hat car is not going to stop" and instantaneously with the yell he saw the vehicle in his peripheral vision as it impacted with the bus. Bryant also testified that there was nothing to obstruct his vision. Bryant testified he was traveling at 55 mph and that he did not hit his brakes until after impact.

¶18. Substantial credible evidence supports the chancellor's finding that the driver breached his duty to slow down. First, the driver himself testified he did not start to brake until after impact. Also as stated above, evidence supports the findings that the driver was in fact speeding at 56 mph. Although there was no sign warning the driver of the intersection, this does not relieve him of his duty to slow down at that point a reasonable person would know an intersection was approaching. Weaver testified that he saw the lights of May's vehicle five seconds before impact. At that moment, the driver should be in the process of slowing down and keeping a proper lookout of the approaching car.

¶19. Substantial credible evidence supports the chancellor's findings that the driver was not keeping a proper lookout. Under *Jobron*, a driver has no duty to take defensive action until such time as a reasonable person would know a car approaching an intersection will not stop. *Id.* From the testimony presented, the chancellor could conclude that a driver keeping a proper lookout and paying attention would have known that May's car was not going to stop at some time before impact. The evidence shows that Weaver saw May's car and saw that it was not going to stop. Weaver was so sure it would not stop that he yelled out. This testimony comes from a passenger sitting half way down the bus and to the left of the driver and point of impact. Weaver had time to see May's vehicle, decipher that it would not stop, and had time to yell out. Bryant, on the other hand, testified that he never even saw May's vehicle until impact. The reasonable inference is that a driver in the front of the bus and on the side of impact who was keeping a proper lookout would know or should have known that May would not stop sometime before Weaver's yell. Since the driver failed to see May's vehicle, and therefore, could not have possibly known it would not stop, the driver breached his duty to keep a proper lookout.

¶20. However, a finding of duty and breach of duty does not end the inquiry. The breach must be the proximate cause of the accident. Therefore, the remaining questions to be answered are: (1) how long of a warning would a reasonable person keeping a proper lookout have between seeing that May was not going to stop and impact? and (2) was this enough time to hit the brakes and avoid the accident?

¶21. Greyhound's own expert concluded that the bus driver would need five seconds of warning time in order to stop the bus in a controlled manner and also testified that "I'm not going to say he can't do it faster with disruption of the passengers and the cargo." The testimony of both Riley and Bonanno lend credence to the fact that there was a period of some seconds after the yell and before the crash. Furthermore, as stated above, a reasonable driver would be slowing down when he first saw May's vehicle five seconds before impact and should have known May would not stop before the yell. All these factors taken in consideration support the chancellor's finding that the driver's failure to react and brake was a proximate cause of the accident. This is admittedly a close call. There were a number of disputed facts. Were we sitting as the trier of fact we might have found differently. Such is not our duty; our scope of review is limited. Therefore, we will not intrude upon the chancellor's findings and conclusions.

¶22. Finally under this assignment Greyhound argues it should be granted a new trial because the theory the chancellor premised liability on was not advanced by plaintiffs in their pleadings, in discovery, or at trial, and was completely contrary to the closing argument of plaintiffs' lead counsel. Greyhound asserts that the

plaintiffs only sought to prove that the driver of the bus had a duty to drive the speed limit and did not attempt to prove the driver was inattentive. Greyhound's basic contention is that it was not afforded a fair opportunity to defend against the theory upon which liability rested.

¶23. We disagree. Mississippi is a notice pleading state. *See* comments to M.R.C.P. 8. In their complaint the plaintiffs alleged that the accident was caused by the negligence of Greyhound's bus driver. Thus, the plaintiffs properly put Greyhound on notice of the allegations against them. Moreover, as outlined above, testimony from the driver and other witnesses was developed at trial by both sides concerning the driver's inattention before the accident, his failure to brake, and the length of warning a reasonable driver paying attention would have before impact.

¶24. Greyhound correctly points out that one of the plaintiffs' attorneys in closing argument stated "[a]s far as liability goes, bottom line, the bus not speeding, this accident doesn't happen, period. If the bus was not speeding, this accident doesn't happen. So we believe that the majority of fault in this case as we look at it is because that bus driver was driving too fast. He was driving close to 70 miles an hour at the time of impact." However, as we demonstrated above, excess speed of the bus driver or failing to slow down was part of the duty which the bus driver breached. The passage quoted by Greyhound above comes from the first plaintiffs' attorney to argue in closing. The second attorney for the plaintiffs made the following argument in closing: "Well, if Greyhound's bus driver had been practicing what Greyhound says he should do in his manual, defensive driving, this accident would have been avoided or lessened. He was not paying attention. He was speeding, and because of that lack of defensive driving coupled with Ms. May's overshooting the stop sign, we end up with an accident, but for Greyhound's contribution in this matter, this accident would not have occurred." The theory upon which liability ultimately rested was properly tried and presented below. This issue is without merit.

## II.

## THE CHANCELLOR MANIFESTLY ERRED IN ASSESSING DAMAGES AND REFUSING TO REMIT DAMAGES AWARDED.

¶25. Greyhound argues that the $1.1 million awards for each of the children's deaths were beyond all measure, unreasonable in amount, and therefore excessive. Greyhound argues that the awards were based on erroneous factual findings and on incorrect legal standards. Greyhound also argues that the personal injury awards to Bonnano and Riley of $680,000 and $285,000 respectively, were also grossly excessive.[1] Greyhound seeks remittitur of these damages to not more than $20,000 for Marcus, $220,000 for Nicholas, $211,000 for Sumone, $260,000 for Bonanno, $200,000 for Riley, or a new trial.

¶26. The chancellor's opinion and order regarding damages to Marcus, Nicholas, and Sumone reads as follows:

> The Court further finds that as a result of the accident in question Marcus May, S[u]mone May and Nicholas May were killed. The Court has heard testimony as to the willingness to pay doctrine, however the Court is not adopting said willingness to pay doctrine at the present time and in assessing the damages of Marcus, S[u]mone and Nicholas May the Court has only considered that testimony

concerning the family relationship that the minors had as well as the economic data which both the plaintiff and defense economist testified to as to what the income could have been expected to have been from these children. The income figures by both were approximately the same for each of the children, however there was a discrepancy in the income concerning S[u]mone May since she was a female child. It further appears that they based their projections on the three children based on the earning background of the mother even though both acknowledged that a male child would probably have earned more income than what a female child would during their life time. The Court further heard testimony from the father of S[u]mone and Nicholas May that he had been employed at Magnetek and his income would have been greater than the mother's. In determining damages for these children the Court finds that under the Mississippi wrongful death statute that parties are allowed to recover a present net cash value of the life expectancy of the deceased together with the loss of companionship and society of the decedent. The two economists whose testimony the Court relied on differed as to what percentage of the income would be used by the minor children and what would be used for the benefit of their families with the defense expert using ninety-four percent to be used by the child based on the child living single their entire life. The Court however gave more weight to the testimony of Dr. Channel as to the amount that would actually be used for the support of family members, said amount being thirty percent for the child and seventy percent for the people in the same household. Of course none of us know and can be certain as to how these children would have lived, however based on the testimony the Court feels that with the background of the families that the children would have probably had children of their own and would have provided support for these children as well as other family members and the Court also recognizes that the surviving members of the family would not have the joy of having these children around as well as any grandchildren for the father and great grandchildren for the grandparents. In assessing these damages the Court has further recognized that Simone May to her family would have contributed different things than Marcus and Nicholas would have, the court recognizing that female members of society, even though in most cases do not have the same ability to earn the same income as male members of society, they no less contribute to and her life is not worth any less than the lives of the two male children. In looking at these factors the Court recognizes that Marcus would have had a life expectancy of approximately 59 years, S[u]mone a life expectancy of approximately 75 years and Nicholas a life expectancy of approximately 65 years. In determining damages the Court has considered testimony of all the family members as well as the economic testimony testified by both the plaintiff and defense experts as well as the life expectancy tables and the Court assesses damages unto and for the death of Marcus May in the amount of 1.1 million dollars, in the death of Nicholas May damages in the amount of 1.1 million dollars and in the death of S[u]mone May damages in the amount of 1.1 million dollars.

¶27. An award of damages by a chancellor is a finding of fact. As stated time and again, "we will not disturb the findings of a chancellor unless those findings are clearly erroneous or an erroneous legal standard was applied." *Matter of Estate of Chambers*, 711 So. 2d 878, 880-81 (Miss. 1998) (citations omitted). Our supreme court has stated that "current Mississippi law limits recovery in wrongful death cases to four general areas: (1) the present net cash value of the life expectancy of the deceased, (2) the loss of the companionship and society of the decedent, (3) the pain and suffering of the decedent between the time of injury and death, and (4) punitive damages." *Upchurch v. Rotenberry*, 96-CA-01164-SCT (¶34)(Miss. 1998) (citations omitted).

¶28. Based on the chancellor's order it is clear that he premised his damage award on the first two

categories of recovery under wrongful death and nothing was awarded based on the latter two categories. It is also equally clear that based on established precedent for calculation of such damages as were awarded in this instance the chancellor could not have possibly awarded equal damages to the three children. Given this fact, and the fact that we are called upon to uphold the greatest award for a wrongful death claim of a minor ever in the State of Mississippi, we are led to the conclusion that the awards for the death of the children as they now exist cannot stand. However, we decline to grant a remittitur as advocated by Greyhound. We instead reverse the chancellor's damage award for the children and remand this case back to the chancery court for a new determination of damages consistent with this opinion.

¶29. To calculate the present cash value of the life expectancy of the deceased one need merely to take the projected annual future income of the deceased multiplied by their work life expectancy, discount it to present cash value and deduct a percentage for the deceased's personal living expenses. *Sheffield v. Sheffield*, 405 So. 2d 1314, 1318, (Miss. 1981); *see also Jones v. Shaffer*, 573 So. 2d 740, 742 (Miss. 1990) ("In computing a person's lost net cash value, a personal consumption factor must be taken into account."). The plaintiffs' economic expert, Carroll David Channell, fixed Marcus's economic loss at $613, 436, Nicholas's economic loss at $589,697, and Sumone's economic loss at $334,074. The defense's economic expert, Kenneth J. Boudreaux, testified that the present net cash value of the three children was for Marcus $1,753.04, for Nicholas $1,602.67, and for Sumone $520.30.

¶30. Channell based his figures on the projected work life expectancy for each child that he attained from a February 1986 bulletin of the U.S. Department of Labor, entitled Effects of Race and Education Bulletin 2254; on the average earnings of a highschool graduate, including the employer paid portion of social security adjusted for taxes, taken from the U.S. Bureau of Census CD Rom, entitled Income and Poverty 1993, with a real wage growth of .87% per year; and a personal maintenance allowance of 30% based on a study by economist Earl Cheit. Channell also discounted his sums to present value. The discrepancies between the children's economic losses were based on the discount factors used as each child would enter the workforce at different years, and the fact that a female child will earn less money and work less time over her lifetime.

¶31. Boudreaux based his figures on the estimate life expectancies of each of the children using the U.S. government vital statistics tables and the work life tables of the U.S. Government Bureau of Labor Statistics; an earning amount of slightly over $8,000 a year, based on Cheryl May's income, with an allowance of a 5% increase a year; and a consumption rate of 94% from the U.S. statistical abstract of the United States. Boudreaux also discounted his sums to present value.

¶32. We should start by saying that the calculation of the present net cash value of the life expectancy of a child is speculative at best for a child has no work history upon which to draw conclusions. The paramount question to be answered is what future annual income should be assigned to a child with no work history? Channell used an average income figure for a highschool graduate, while Boudreaux used Cheryl May's yearly income of $8,000.

¶33. The chancellor in his opinion assumed that both economists based their figures on the earning background of the Cheryl May. This was simply not true, and it was manifest error for the chancellor to state so in his opinion. Furthermore, it is manifest error to tie the children's projected future income to that of their mother. Boudreaux himself testified that he had no opinion about what the proper base income was for any of his calculations, and he simply used Cheryl May's income figure provided to him. We see no

reason to ground the future income of the children based solely on the income of the mother. We can only guess if Greyhound would still want to tie the children's future income to that of their mother if at the time of her death she was making six figures. We hold that the base income of the children should be established with some type of average income for persons of the community in which the decedents lived.

¶34. The chancellor next used the personal consumption rate of 30% as advocated by Channell. Channell testified that this consumption rate was based on the projection that the children would marry and have children, or that they would have partners who would share common expenses. Channell testified that the consumption rate is lowered because with children one would consume less on oneself, and if married one would consume less than if one were single. Channell further testified that for a forty-five year old man who had never married and lived alone, he would use a 60% consumption rate. On cross-examination, Channell testified as follows:

> Well, case specific, no. For young children you have an issue that -- the question is -- the economic question is, what position are they going to be in over the remainder of their lives? Are they going to be married? Are they going to live with someone? Are they going to have a roommate? Are they going to -- do they have sisters or other relatives that are going to survive them? If that's the case, then a thirty percent consumption allowance is certainly appropriate because the income they earn could be available to the support of family members, could be available to the support of parents in their old age. There are numerous things that are allocations that can be made from that income.

> When [you] go up to -- you try to use personal savings rates of three percent and a consumption rate of ninety-seven percent, then certainly that's out of line in my view. That's not personal consumption. In fact, I would argue that the maintenance allowance should consist of that amount of monies necessary to sustain a meaningful life style. In other words, food, clothes, shelter, transportation.

¶35. Channell's testimony was that the children would be spending money on hypothetical future spouses and children, therefore their consumption rate is lowered to account for the money that would have been spent on support of the hypothetical future spouses and children. It is an attempt to allow beneficiaries to recover money that the deceased would have spent on them during the deceased's lifetime by lowering the deceased's personal consumption rate. In essence, to allow beneficiaries to recover everything they would have received if the deceased had lived. We hold that it was manifest error for the chancellor to use a consumption rate which is based on a hypothetical prospect that the children would eventually have a spouse and have children of their own, both of which require support.

¶36. Our supreme court has stated that "a wrongful death action is intended to compensate the heirs of the deceased for losses stemming from the death of the injured party." *Gentry v. Wallace*, 606 So. 2d 1117, 1120 (Miss. 1992). A wrongful death action is not intended to compensate hypothetical future beneficiaries. Since the children were not supporting anyone at the time of their death, there is no one who could possibly recover for loss of support. The United States Court of Appeals for the Fifth Circuit applying Mississippi law was asked to overturn a personal consumption rate of 94% (i.e., savings rate of 6%) because the figure did not take into account earnings that would have been spent on the deceased's family. *Butler v. United States*, 726 F.2d 1057, 1067 (5th Cir. 1984). In rejecting this argument the Fifth Circuit held:

> Plaintiffs argue that the trial court erred in applying this 6% figure to determine net lifetime earnings, stating that the figure does not take into account earnings that would have been spent on, for example,

the deceased's family and friends. Plaintiffs, however, offered no evidence regarding these amounts. The only evidence in this regard came from Dr. Boudreaux, who testified otherwise:

"If the heirs, for instance, had been a spouse or children that could have been expected to be supported by the income of that individual, then the spouse and the children in economic justice could expect to receive an amount of money that could be invested in order to produce their lost support across the future, in addition to the residual estate. The implication being because that individual is not working, the income that would have been used to support them is not available. However, we have no spouses or surviving children, so consequently there are no individuals that could have expected pecuniary economic support from the income of those individuals, other than some residual estate."

Supp.R. at 156.

We find that the district court's finding in this regard, based on the evidence presented, is not clearly erroneous.

*Id.*

¶37. Mississippi has never adopted the idea of lowering a consumption rate or increasing a saving rate to specifically make up for money spent on statutory beneficiaries during the deceased's lifetime. We decline to offer any opinion as to whether Mississippi recognizes such a calculation in determining the present net cash value of the life expectancy of the deceased. However, even if Mississippi recognized such, it would not be proper in this instance as the children were not supporting anyone at the time of their deaths.

¶38. The chancellor did not differentiate his damage award to specify how much was awarded for economic loss and how much awarded for loss of society and companionship. However, by deducting from the chancellor's final award of $1.1 million for each of the children the economic loss testified to by plaintiffs' witness Channell, the balance attributable to loss of society and companionship is $486,564 for Marcus, $510,303 for Nicholas, and $765,926 for Sumone. Our supreme court has stated that "under section 11-7-13, the wrongful death action is to compensate the *beneficiary* for the loss of companionship and society . . . ." *Estate of Jones v. Howell*, 687 So. 2d 1171, 1178 (Miss. 1996) (emphasis added).

¶39. It was manifest error for the chancellor to award any damages for the loss of society and companionship of Marcus for he had no statutory beneficiaries. Marcus's father died before he was born and his mother, half-brother, and half-sister died simultaneously in the accident. "If none of the heirs named in the statute survived the wrongful death victim, then the recovery under the statute would become an asset of the estate to be used as any other asset thereof." *Partyka v. Yazoo*, 376 So. 2d 646, 650 (Miss. 1979). There is simply no one who could have recovered damages for the loss of society and companionship of Marcus.

¶40. The only statutory beneficiary in this case is Gerald Sutton, Nicholas and Sumone's father. He and he alone can recover damages for the loss of society and companionship and for only the loss of society and companionship of Nicholas and Sumone. The chancellor stated in his opinion "the Court also recognizes that the *surviving members of the family* would not have the joy of having these children around as well as any grandchildren for the father and *great grandchildren for the grandparents*." (emphasis added). Testimony at trial was given by Shirley Williams, Gerald Sutton's mother and grandmother to Nicholas and Sumone. She testified about her relationship with the children. Johnlin Gary, Gerald Sutton's sister, testified

describing her relationship with Gerald Sutton's two children. Johnny May, Cheryl May's father and grandfather of the children, testified about his relationship with the children. Lisa May, Cheryl May's sister, testified about her relationship with the children. Neither surviving members of the family (except for Gerald Sutton) nor grandparents can recover for loss of society and companionship of these children for they are not statutory beneficiaries. The chancellor was manifestly in error in awarding damages based on these individuals' loss of society and companionship of the children.

¶41. The chancellor's opinion and order regarding damages to Bonanno and Riley was as follows:

> THE COURT FINDS that the plaintiff, Nancy Bonanno, suffered damages and expenses including medical expenses, future medical expenses, future medical expenses, loss of past wages, loss of future wages, damages for pain and suffering and general enjoyment of life, past, present and in the future. The Court in assessing these damages has considered the approximately $35,000 of medical expenses that were incurred as a direct result of the accident in question, the need for future pain medication both prescription and nonprescription that was testified to by the doctors that testified both for the plaintiff and for the defense. The Court finds that the disability rating to the body as a whole testified to by Dr. Hines was probably excessive, however based on his testimony as well as that of Dr. Hartwig it is quite obvious that some disability to the body as a whole has to be assessed and the Court has likewise considered this in making its determination as well as the Court's observation of the plaintiff, Nancy Bonanno, and the uncontradicted testimony of Dr. Nelson. Based on the injuries received, the observation of the plaintiff as well as the medical testimony Ms. Bonanno was unable to work for approximately nine months after the accident and therefore had lost wages for that period of time and because of the injuries to her arm will suffer the inability to obtain the same wage in the future. That coupled with the testimony of Dr. Nelson that she will suffer pain for the remainder of her natural life, said life expectancy to be 37.7 years, and considering all of this testimony the Court assesses her damages in the amount of $680,000.

> The Court further finds that the plaintiff, Robert Riley, suffered damages and expenses including medical expenses, past, present and future together with lost wages, past, present and future, damages of pain and suffering and general enjoyment of life past, present and future. That even though Mr. Riley's income was approximately the same in the year after the wreck as it was in the year before based on the testimony the prior year was based on Mr. Riley working approximately eight months to earn that income when it took him twelve months during the year of 1996 to earn the same income. That based on the uncontradicted testimony Dr. Rizk advised him that he could not go back to his same job and based on the Court's observations of Mr. Riley as well as his testimony the Court finds this to be credible and that his ability to stay in the same job would be precluded in the future. That he further suffered medical damages in the amount of approximately $5,500 as a direct result of the accident. That he will further need surgery to repair scars that were a result of the accident as well as pain medication both prescription and nonprescription for the remainder of his life and that based on the testimony of Dr. Rizk suffered a fifteen percent disability to the body as a whole and even though this may be excessive the uncontradicted testimony was that he would have suffered a disability to the body as a whole and therefore he is entitled to reimbursement for these damages. That according to the life expectancy table a twenty-eight year old white male would have a life expectancy of approximately 46.3 years and that coupled with the medical testimony and the observations by the Court of Mr. Riley the Court finds that Mr. Riley has suffered damages in the amount of $285,000.

¶42. We hold that the chancellor was neither manifestly wrong nor clearly erroneous in his damage awards for Bonanno and Riley. If we were sitting as the trier of fact, our damage award for both Bonanno and Riley may not have been as high, but nonetheless, the chancellor's award is supported by substantial evidence. Furthermore, the awards are consistent with other similar awards upheld by our supreme court. *See W.J. Runyon & Son, Inc. v. Davis*, 605 So. 2d 38, 50 (Miss. 1992) ($1.2 million verdict based on negligence affirmed for a 25 year old man with $64,401.06 in medical expenses, lost wages of $21,158.67, a 12 percent permanent partial impairment to the body as a whole, and pain and suffering); *Detroit Marine Engineering v. McRee*, 510 So. 2d 462, 471-72 (Miss. 1987) ($1 million verdict based on negligence and strict liability affirmed for a man with $18,000 in medical expenses, lost wages of $17,000, and pain and suffering.).

¶**43. THE JUDGMENT OF THE CHANCERY COURT OF SIMPSON COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART. ALL COSTS OF THIS APPEAL ARE TO BE ASSESSED EQUALLY BETWEEN APPELLANT AND APPELLEE.**

**KING, P.J., BRIDGES, DIAZ, IRVING, AND PAYNE, JJ., CONCUR. SOUTHWICK, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J. AND BRIDGES, J. MOORE AND LEE, JJ., NOT PARTICIPATING.**

SOUTHWICK, P.J., CONCURRING

¶44. The following is substituted for the initially released concurring opinion. I agree with the majority that we must affirm the liability determination as well as reverse some of the damage awards. This separate opinion expresses my view that the current state of the law creates unnecessary difficulties in a case such as this.

¶45. Even before reaching the distortions caused by the state of the law, I wish to note that the procedure of bringing the suit in chancery court was somewhat askew. Greyhound's first enumerated defense in its answer was the court's lack of jurisdiction. That defense was never made into a motion. No ruling was apparently ever sought on jurisdiction, and therefore the objection was abandoned. For the reasons stated, I find that the chancellor should have addressed and resolved the apparent lack of jurisdiction. Greyhound's failure to pursue the matter moots the issue here. Nonetheless, the legislature has created the jurisdictional rules, and it is for the courts to enforce and not ignore them.

¶46. The suit began as a claim by the estates of the three children against the estate of their mother as well as against Greyhound. The authority for the suit was the wrongful death statute. Miss. Code Ann. § 11-7-13 (Supp. 1998). Such suits are within the jurisdiction of circuit courts, not chancery.

¶47. This complaint was filed in the estate proceedings for Cheryl May, the driver of the car who ran the stop sign and the mother of the three other people killed in her car. The petition for letters of administration had been filed the week before the complaint. It would appear the estate was opened so that there would be an administrator to be made a defendant. That is proper. A person who desires to obtain payment of damages for personal injuries allegedly caused by the decedent may institute the proceedings in order to

have an administrator named who can be made the defendant. *Powell v. Buchanan,* 245 Miss. 4, 147 So. 2d 110 (1962); Miss. Code Ann. § 91-7-63 (Rev. 1994). Here, the petition for letters of administration is not in the record; whether the petition was filed by the person named as administrator or by one of the plaintiffs in the action filed the next week is immaterial. What was improper was to file suit before ninety days had passed from the naming of the administrator. Miss. Code Ann. § 91-7-239 (Rev. 1994). Instead, only eight days had gone by. Without the administrator's complaining, the issue is waived. *Great Southern Box Co. v. Barrett,* 231 Miss. 101, 108, 94 So. 2d 912, 914 (1957).

¶48. However, the mere fact that a defendant is the administrator of an estate does not permit the wrongful death action to be brought in the estate proceedings. The following statute is instructive:

> Executors, administrators and temporary administrators . . . shall also be liable to be sued *in any court* in any personal action which might have been maintained against the deceased."

Miss. Code Ann. § 91-7-233 (Rev. 1994) (emphasis added). The wrongful death action that could have been brought against Cheryl May in circuit court had she lived could instead be brought against May's executor in circuit court.

¶49. The relationship between the requirement that the "personal representative" of the decedent be the named defendant in a tort action, and the need to have an open estate in order to have an administrator, was explained by the *Buchanan* court:

> [A tort plaintiff] had a right to present his claim in a *court of law*, and he had a right to present it against a representative of the estate. It was not necessary to undertake to surcharge the final account. When the petition was filed by the petitioner stating that he had an unliquidated claim against the estate and that the estate had been closed so he could not present it; and the petition showed his claim was not barred, then the chancellor should have appointed another administrator. The widow should have been appointed, or reappointed, if she desired to serve, but if she did not then the court should have appointed some other person to serve as such administrator. . . . The administration had been closed with unfinished business pending, and with the petitioner under the law and our statutes yet having a right to present his cause of action *in the proper court*.

*Buchanan*, 245 Miss. at 10, 147 So.2d at 112 (emphasis added). This makes evident that the claim is to be brought "in the proper court," regardless of the court in which the estate has been opened. The proper court for the *Buchanan* tort claim was a "court of law," namely, the circuit court.

¶50. I also do not find this to be a claim of a creditor that would permit it to be filed in the estate action. An unliquidated tort claim is an inchoate and uncertain claim that cannot be probated. Robert Weems, Wills & Administration of Estates §2-20 (1988). "Claims arising out of tort . . . are not probatable." *Id.* Instead, this is categorized as a "liability" and not a claim. Moreover, suit is to be brought not within the ninety-day period for filing claims for probate but within the applicable statute of limitations for the wrongful death action. *Townsend v. Estate of Gilbert*, 616 So. 2d 333, 336 (Miss. 1993). As already pointed out, suit can be brought only *after* ninety days, not *before*. The *Townsend* suit was brought by an administrator of one estate against the administrator of another for wrongful death. It was properly filed in circuit court, not

in the chancery proceedings of the defendant-administrator. *Id.*

¶51. There is one estate statute that goes beyond the issue of filing claims for probate and provides that the court in which the letters of administration were granted "shall have jurisdiction to hear and determine all questions in relation to the execution of the trust of the executor, administrator, . . . or other officer appointed for the administration and management of the estate, and all demands against it" by, among others, heirs, devisees, "creditors, or others. . . ." Miss. Code Ann. § 9-5-83 (Rev. 1991). First, I have found no tort suit brought against the executor or administrator of an estate in which this statute was used to argue that jurisdiction was proper in the estate proceedings themselves. Instead, as already pointed out the reported cases demonstrate that even if an administration was commenced at the instance of a tort claimant, the subsequent suit is in circuit court. Secondly, the argument that this statute grants jurisdiction is not tenable because as already discussed a tort claim against the personal representative as the successor to a decedent is not a claim against the estate that is to be probated or otherwise administered within the estate. Therefore, the benefit of drawing into the estate proceeding all relevant claims against the estate is inapplicable.

¶52. When in the past jurisdiction for a wrongful death action has been found to be in chancery court, it is because one of the parties -- as here -- was a non-resident corporation. In those cases the suit was brought as an attachment action. One case held that bringing a wrongful death suit on this basis in chancery court "was thoroughly settled more than thirty years ago in the case of *Clark v. Louisville & N. R. Co., et al.,* 158 Miss. 287, 130 So. 302 [1930.]" *Illinois Central R.R. Co. v. Gwin*, 246 Miss. 67, 69, 149 So. 2d 340, 341 (1963). In *Clark*, the plaintiffs brought an attachment action against the railroad. The supreme court held that even though the railroad had agents in the state, it was a nonresident for purposes of the attachment statute. *Clark*, 130 So. at 306. The statute was held to create a right to sue *in rem*, in order to subject "lands or tenements" in Mississippi owned by a nonresident to the debts of a claimant, or to sue a resident who is indebted to the nonresident. *Id.* at 305-6. There are more recent examples of the attachment statute being used in this way. *Dickey v. Parham*, 331 So.2d 917 (Miss. 1976).

¶53. To initiate an attachment, the complainant must file an affidavit that asserts, among many other requirements, the specific reason "why the complainant's ability to recover the amount of his claim may be endangered" if attachment is not ordered; a description of the property that is to be attached; and a listing of all persons who have an interest in the property. Miss. Code Ann. § 11-31-2 (1) (Supp. 1998). The chancellor must find that in fact the complainant's rights would be "significantly impaired" without the attachment, must order security for the attachment, and then enter an order for attachment. Miss. Code Ann. § 11-31-2 (2). The defendant can ask for an immediate post-seizure hearing. Miss. Code Ann. § 11-31-2(3).

¶54. None of this occurred in the present case. There was no mention in the complaint that the jurisdictional basis for the suit was attachment, no application and affidavit for attachment, no description of property (buses presumably) of the defendant that was to be seized, nor any other feature of the procedure. This quite simply was not an attachment. Whether a justification for attachment could even have been proven, namely, that the plaintiff's rights would be impaired if Greyhound's property was not seized in advance of litigation, is open to question.

¶55. Though no jurisdictional basis for this suit is evident, it is also plain that no party complains about it. A judgment from a chancellor is not to be reversed solely because jurisdiction properly was in the circuit

court. *Aetna Cas. and Sur. Co. v. Berry*, 669 So. 2d 56, 73 (Miss. 1996); Miss. Const. art 6, § 147. The court has applied this rule when the argument on appeal for a wrongful death judgment brought in chancery was that the attachment was of a frivolously small amount of money owing to the nonresident defendant, making attachment "a mere device to confer jurisdiction" when it did not otherwise exist. *Matthews v. Thompson,* 231 Miss. 258, 290, 95 So.2d 438, 453 (1957). Even so, a chancellor should not ignore jurisdiction. Despite that the parties may be in some rough if only tacit agreement that chancery serves their varied interests, if the chancellor notes that there is no jurisdiction then he should transfer the case. Warner's Griffith, Mississippi Chancery Practice §515 at 323 (1991).

¶56. This also means that no jury has considered and passed on the liability or the damage claims. A party may by motion seek to have a jury trial in chancery court. *Id.,* 231 Miss. at 288-90, 95 So. 2d at 451-53. The record reveals no such motion, and thus the chancellor's discretion to permit a jury trial was never invoked. Since there was no jury, the chancellor's fact-findings receive deference as would those reached by a jury, though the review is by a manifest error standard. *Illinois Cent. R.R. Co. v. Nelson,* 245 Miss. 395, 410, 146 So. 2d 69, 73 (1962).

¶57. As well-explained in the majority opinion, the accident occurred when a Greyhound bus was proceeding with the right-of-way along a rural Jefferson Davis County road. The plaintiffs include the estates of the passengers and driver of a vehicle that failed to stop at a stop sign and collided with the bus. The sole present argument for negligence is that the bus driver was failing to keep a careful look-out for eventualities such as these. As a result of that negligence, the chancellor found the bus driver and company to be 10% at fault and the private automobile driver to be 90% at fault. Since the driver of the private vehicle was insolvent and uninsured, Greyhound was held responsible for substantial damages because of the partial joint and several liability that still exists in this state.

¶58. My concern initially is about the continuing distortions caused by what at best is an antiquated statute on the duty of a driver on a through road. That statute requires a driver to slow at every intersection. Whether applied to substantial intercity roads or smaller city streets, such a rule has little relevance to present day driving conditions. The rule was created in 1938. Using almost the same language as in the 1938 original, the present statute requires the following:

> The driver or operator of any motor vehicle must decrease speed when approaching and crossing an intersection, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding road, or when a special hazard exists with respect to pedestrians or other traffic.

Miss. Code Ann. § 63-3-505 (Rev. 1996). On rehearing Greyhound has emphasized that this statute is not relied upon by the plaintiffs and is not even cited in their briefs. Nonetheless, the statute fundamentally affects the case law that governs the duties of drivers on through highways.

¶59. The Greyhound bus driver's obligations depend in part on this statute, a point developed in the majority opinion. In my view, the supreme court has within the limits of the statute attempted to bring some reality to that rule by also holding that a person on a through road is "entitled to assume that crossing traffic will obey stop signs, look for oncoming vehicles" and otherwise yield. *Vines v. Windham,* 606 So. 2d 128, 131 (Miss. 1992). A different statute provides that once a person has stopped, he may enter onto the through street unless an approaching vehicle is so close as "to constitute an immediate hazard." Miss. Code Ann. § 63-3-805, *quoted in McKinzie v. Coon*, 656 So. 2d 134, 138 (Miss. 1995). After making a

reasonable entry onto the through road, the driver from the side road gains the "right-of-way" even though initially that driver had to stop.

¶60. All of these rules must work together. They mean that someone on a through street is not exempt from normal standards of caution. Being on the through road does not permit a driver to maintain a constant speed and smash into anyone who gets into his way who comes from a side street. However, what is not needed is a rule independent of reasonable care that requires the person on the through street to slow at all intersections. Since few if any drivers slow at every intersection nor does there appear a sound basis for doing so, this creates an artificial standard that skews fact-finding.

¶61. What the statute was intending to accomplish is clearer when viewing the original enactment. The statutory language under which we are now measuring negligence is the second-generation approach to speed restrictions. The first statute was referred to in one contemporary precedent as the "motor car speed statute." *Lucedale Automobile Co. v. Daughdrill,* 154 Miss. 707, 711, 123 So. 871, 872 (1929). It set a variety of speed restrictions, including this:

> No person shall operate a motor vehicle on a public highway . . . at a greater rate of speed than is reasonable and proper, having due regard to the traffic and use of the highway, or so as to endanger the life or limb of any person or the safety of any property, or in any event on any public highway where the territory contiguous thereto is closely built up, at a greater rate of speed than fifteen miles per hour, or elsewhere in any incorporated city, town or village at a greater rate of speed than fifteen miles per hour, or elsewhere outside of any incorporated city, town or village at a greater rate of speed than thirty miles per hour, subject, however, to the other provisions of this act.

1916 Miss. Laws, ch. 116, § 2, codified in Hemingway's Code 1927, § 6680. A provision that later evolved into the special hazard rule applicable here, stated that when "approaching a bridge, levee, sharp curve or steep descent, and also in traversing such bridge, levee, curve or descent, a person" shall not drive more than ten miles per hour, "and upon approaching a crossing of intersecting highways at a speed not greater than reasonable and proper, having due regard to the traffic then on such highway and the safety of the public." 1916 Miss. Laws, ch. 116 (codified at Hemingway's Code 1927, § 6682).

¶62. Sandwiched between these two sections and giving an instructive historical context for the provision from which the statute to be applied here soon evolved, was a rule that no motor vehicle "shall pass a person driving a horse or horses or other domestic animals, [or pedestrians], at a greater rate of speed than eight miles per hour. . . ." 1916 Miss. Laws, ch. 116 (codified at Hemingway's Code 1927, § 6681).

¶63. The next generation of speed and safety statutes contained the language that is still being applied to accidents such as occurred here. It was one section of an lengthy set of measures adopted in 1938 called the "Uniform Highway Traffic Regulation Act":

> (a) No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing.

> (b) Where no special hazard exists the following speeds shall be lawful but any speed in excess of said limits shall be prima facie evidence that the speed is not reasonable or prudent and that it is unlawful:

> 1. Twenty miles per hour in any business district;

2. Twenty-five miles per hour in any resident district;

3. Fifty-five miles per hour under other conditions.

Provided however, the speed limit of trucks shall be forty miles per hour.

(c) The fact that the speed of the vehicle is lower than the foregoing prima facie limits shall not relieve the driver from the duty to *decrease speed when approaching and crossing an intersection, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, or when special hazards exist with respect to pedestrians or other traffic . . . .*

1938 Miss. Laws ch. 200, § 51 (emphasis added). As can be seen, the current language regarding slowing at intersections and while cresting hills and along winding roads all began in 1938.

¶64. It is important to understand the condition of state highways when the 1938 slow-at-every-intersection rule was created. Mississippi then had about 6,200 miles in the state highway system: fewer than 3,500 miles were paved, 2,400 miles were gravel, and 350 miles were dirt. Mississippi State Highway Department, Mississippi Highway Facts 13-14 (1942). Only an additional 320 miles of paved roads were maintained by counties, while 52,000 miles of gravel or dirt county roads existed; only 1,000 miles of federal highways were in the state. *Id.* at 13 & 16-17. Traveling these roads were 230,000 in-state vehicles. *Id.* at 23. The pavement was intermittent, as the first highway to be paved completely across the state had been open for less than a year. James B. Gibson, *Huge Celebration Marks Formal Dedication for First All-Paved Highway,* Daily Clarion-Ledger (Jackson, Miss.), April 8, 1937, at 1, 8. At the dedication of that highway, a speaker called on the 1938 legislature to enact "uniform safety legislation to govern traffic on the newly paved roads." *Id.* It is that dated legislative response that largely still governs today.

¶65. In addition, it would appear that a statewide, systematic program of erecting stop signs and other warning devices also began or at least was accelerated with the 1938 Act. 1938 Miss. Laws ch. 200, §§ 28-35. That suggests that many intersections were unmarked with any traffic control signs, which would make understandable that every vehicle should slow at every intersection.

¶66. Equally revealing about road conditions is that two years before the 1938 statute, the governor said that his "sole desire [regarding roads] is to see that we are gotten out of the mud, dust and gravel as quickly as possible." Corey T. Lessig, *"Out of the Mud": The Good Roads Crusade. . .,* LX J. Miss. Hist. 50, 70 (1998). By 1998, Mississippi drivers were off the dirt and gravel with paved roads totaling almost 50,000 miles, not the 4,000 of 1938. Mississippi Department of Transportation, Mississippi Public Roads: Selected Statistics iv-v (1998). Over 2,000,000 state-licensed vehicles used these roads, almost a ten-fold increase. Mississippi Statistical Abstract 365 (1997). Quite obviously the nature of highway travel in the state has changed radically and all the various parts of former absolute rules to slow for horses, hill crests, and highway crossings have become obsolete.

¶67. The supreme court has given some attention to the impracticalities of the rule but is still bound by the statutory language:

In order to be in violation of the statute one must fail to reduce his speed from the maximum provided when one of the conditions set out in [1942 Miss. Code § 8176 (b) for slowing at intersections,

> curves, and hill crests] is present. In this case, Mrs. Adams was traveling at a speed less than the maximum as she approached the intersection and whether her failure to further reduce her speed under the prevailing circumstances was negligence was a question of fact for the jury to determine.

*Richardson v. Adams,* 223 So. 2d 536, 538 (Miss. 1969). The defendant in *Adams* was going 50-55 miles per hour, which was less than the maximum of 60. Therefore the failure to slow even more was at most a jury question regarding negligence. Whenever there is some evidence to support that a driver was going the maximum speed or more, the statutory duty to slow is invoked.

¶68. This obsolete statute fully served its purpose long ago and needs to be replaced by something that allows the focus to be on reasonable care in driving. In most circumstances slowing at every intersection would not appear to be part of the standard of due care and should not be made so by statute. Something besides the mere existence of an intersection should invoke the duty to slow. The present rule can lead to too easy a finding of negligence when it does not exist and for blame too quickly to be shifted from where it belongs.

¶69. Greyhound makes logical and even compelling arguments about the weaknesses in the proof regarding the warning that its bus driver received of the emergency being created by the driver of the automobile approaching from the side road. Much of the evidence, especially that indicating that twenty seconds or more prior to the accident someone was yelling in fright, is simply not plausible. Estimates of time, like estimates of distance, are inherently unreliable. All that being accepted, it was still for the fact-finder to determine based on all the evidence and the reasonable inferences that arose whether a preponderance of the credible evidence supported that some negligence existed on the part of Greyhound. I cannot find that this evidence, even accepting the vagaries of perceptions, memories, and candor, was unusable. On these contested facts and on the present state of the law, I find legally adequate evidence to support the chancellor's conclusion.

¶70. Finally, what makes this case exceptional is largely a result of the operation of this state's vestige of joint and several liability. In 1989 the legislature considered a bill to abolish all joint and several liability and make tort-feasors solely responsible for their own fault. 1989 Miss. House J. 235-237. Instead, the compromise was to place a floor beneath a plaintiff's recovery and make all defendants liable regardless of their percentage of fault for half of the plaintiff's recoverable damages. Miss. Code Ann. § 85-5-7(2) (Rev. 1991). Without that latter provision, the chancellor's finding that Greyhound was 10% at fault would have limited the company's liability to 10% of the damages. Such a result would not seem so divorced from reason as is the result of the present case, in which members of the family of the person who was found to be 90% at fault are recovering extraordinary damages from the entity that is only 10% at fault.

¶71. The 1989 provision to impose joint and several liability to the extent necessary to compensate an injured party for fifty percent of its recoverable damages, no matter how small a defendant's fault may be, was modeled on a statute adopted in Louisiana in 1988. Miss. Code Ann. § 85-5-7 (2); 1988 La. Acts, No. 430, § 1, *quoted at* La. Civ. Code Ann. § 2324, Historical and Statutory Notes (1997). Louisiana has since repealed its provision; now that state has no joint and several liability. La. Civ. Code Ann. § 2324 B (1997).

¶72. Greyhound implies that the chancellor arbitrarily doubled the award of damages, perhaps to permit full recovery of the initial award because Greyhound would be responsible for half of the final award. If the record in fact revealed that the chancellor had engaged in any manipulation of the award for such purposes,

I would find that to be reversible error. At best, though, the record indicates that at the close of the evidence the chancellor discussed possible damage awards that was followed in the judgment by a more careful consideration of the evidence. An award based on that tentative discussion would have been about $440,000, while the final award was $680,000. I cannot find something akin to a prima facie case of manipulation of damages based on these facts.

¶73. By highlighting these statutes, I am suggesting that the attention of the legislature should be brought to bear on the distortions that are caused. As long as the statutes exist they must be applied fairly but unhesitatingly. That is what the majority has done. Though my joinder may appear to be with some hesitation, it is nonetheless total.

**McMILLIN, C.J. AND BRIDGES, J., JOIN THIS SEPARATE OPINION.**

1. Greyhound takes no exception to the quantum of the award of $50,000 to Paul Cotter.